## OPINION AND AWARD

IN THE MATTER OF ARBITRATION

BETWEEN

CLEVELAND CLINIC LUTHERAN
HOSPITAL,

     Employer,

And

SERVICE EMPLOYEES
INTERNATIONAL UNION,
DISTRICT 1199, WV/KY/OH

     Union.

FMCS No. 240822-09262
Grievant:   Tanesha Jameson
Issue: Positive Random Drug Test
Date of Hearing:  2/12/25
Briefs Received:  4/28/25
Date of Decision:  5/22/25

## APPEARANCES

**FOR THE EMPLOYER:**

Ryan Smith, Esq.
Frantz, Ward LLC
200 Public Square, Suite 3000
Cleveland, Ohio 44114

**FOR THE UNION:**

Josh Norris, Executive Vice President
SEIU Local 1199
1395 Dublin Road
Columbus, Ohio 43215

## IN THE MATTER OF ARBITRATION BETWEEN

CLEVELAND CLINIC LUTHERAN
HOSPITAL,

     Employer,

And

SERVICE EMPLOYEES
INTERNATIONAL UNION,
DISTRICT 1199, WV/KY/OH

     Union.

FMCS # 240822-09262
Grievant:  Tanesha Jameson
Date of Decision:

## I.  STATEMENT OF THE CASE

Lutheran Hospital (a/k/a Cleveland Clinic) ("Employer" or "Hospital"), and the Service Employees International Union, District 1199 WV/KY/OH, ("Union") are parties to a collective bargaining agreement effective May 1, 2023 through April 30, 2026.  The parties' agreement governs the wages, hours and other terms and conditions of employment of all of the members of the bargaining unit employed by the Hospital.  It also provides for a grievance procedure culminating in final and binding arbitration as the mechanism to be used to resolve any differences between the Union and the Employer concerning the interpretation, or application of, or compliance with, any provision of this Agreement.

At issue in this case is a grievance filed by the Union on behalf of the Grievant, Tanesha Jamerson.  According to the Corrective Action Notice issued September 9, 2024, the Grievant violated the Employer's Substance Abuse Policy by testing positive on a random drug test conducted on July 12, 2024 as a part of the Employer's Expanded Drug Test program.  After complying with mandatory treatment and follow-up requirements, Grievant was issued Corrective Action at Step 3, Final Warning. The Union filed a grievance on July 12, 2024, protesting the Hospital's actions in subjecting the Grievant to a random drug test.

When the parties were unable to resolve the dispute through the grievance procedure the Union invoked arbitration.  The undersigned was mutually selected as arbitrator from a panel

provided by the Federal Mediation and Conciliation Service.  Thereafter a hearing was conducted at the administrative offices of the Cleveland Clinic in Cleveland, Ohio on February 12, 2014.  No court reporter was present.  In the course of the hearing both parties were afforded full opportunity to present testimony and other evidence, cross-examine witnesses called by the opposing party and offer arguments in support of their respective positions.  In accordance with arrangements that were made at the conclusion of the hearing, upon receipt of post-hearing briefs the record was closed pending issuance of this Opinion and Award.

## II. <u>STATEMENT OF THE ISSUE</u>

The parties have stipulated that the issue to be decided herein is as follows:

Did the Company have just cause to issue discipline to the Grievant, Tanesha Jamerson, and if not, what shall the remedy be?

## III. <u>RELEVANT CONTRACT PROVISIONS</u>

## <u>COLLECTIVE BARGAINING AGREEMENT</u>

### <u>ARTICLE 1</u>
### <u>MANAGEMENT RIGHTS</u>

<u>Section 1</u>. The management of the Hospital, the control of its premises, and the direction of its working force are vested solely and exclusively with the Hospital….The right to manage includes, but shall not be limited to, the right to… and to establish and enforce reasonable rules of conduct, or safety, of efficiency, and order in its operations and on its premises….The exercise of the Management Rights set forth herein is subject only to such restrictions and regulations governing the exercise of these rights as are expressly specified in this Agreement.

<u>Section 2</u>.  In addition, unless otherwise restricted by an express term of the Agreement or by a letter of understanding or other document executed by the parties, all rights are exclusively reserved by the Hospital.  Further, the exercise of enumerated or reserved management rights shall not be subjects of negotiation with respect to the decision, during the term of this Agreement.

<u>Section 3</u>.  Any of the rights, powers, authority and functions the Hospital had prior to the negotiations of this Agreement are retained by the Hospital, except as expressly abridged by a specific provision of this Agreement or by a letter of understanding or other document executed by the parties.  By not exercising rights, powers, authority and functions reserved to it, or by exercising them in a particular way, the Hospital shall not be deemed to waive said rights, powers, authority and functions or its right to exercise them in some other way not in conflict

with a specific provision of this Agreement or a letter of understanding or other document executed by the parties."

**ARTICLE 7**
**GRIEVANCE PROCEDURE**

Section 1.        For the purpose of this Agreement, the term "grievance" is defined as a dispute between the Hospital and the Union, or between the Hospital and an employee concerning the interpretation, or application of, or compliance with, any provision of this Agreement.

Section 5.  The arbitrator shall have jurisdiction only over disputes arising out of grievances as defined in Section 1 of this Article including disciplinary actions.  He shall have no authority to add to or subtract from, amend or modify, in any way, any of the terms or conditions or provisions of this Agreement.  The decision of the arbitrator shall be final and binding upon all employees, the Hospital and the Union.  The fees and expenses of the arbitrator and the Federal Mediation and Conciliation Service shall be shared equally by the parties.  Each party will pay the costs of preparing and presenting its case to the arbitrator.

**ARTICLE 16**
**SUBSTANCE ABUSE PREVENTION**

Section 1.        The Union and the Hospital agree that, in order for the Hospital to ensure the provision of safe, high-quality patient care services and to protect the safety and wellbeing of its patients, employees, and visitors, it is essential that all employees report for and perform their duties free from any trace of drugs or alcohol.

Section 2.        As used in this Article, the term "prohibited substance" includes alcohol, marijuana, cocaine, narcotics, tranquilizers, amphetamines and barbiturates, and their derivatives, and all other similar substances, whether controlled or not controlled, which in any manner alter normal perception, thought functions, behavior or mood.

Section 3.        Should the Hospital have reasonable cause to suspect that an employee may have used a prohibited substance prior to reporting for work or while at work, or that an employee's performance or behavior may be affected by his use of one or more prohibited substances, the following procedure will apply:

(a)        The employee will be required to provide blood and/or urine specimens to the Occupational Health Clinic (Mobile Med. Tech when Occupational Health Clinic is closed) on paid time.  Before the specimen is provided, the employee shall be given the opportunity to list all medications taken on the "Consent for Testing" form.  Failure or refusal to provide specimens for testing will result in immediate suspension and the employee will be subject to further discipline, up to and including termination.

(b)        The specimens will be tested at the Hospital's expense by a certified testing laboratory.  The laboratory and types of tests to be used shall be mutually agreed upon by the parties.  If the preliminary screen results in a positive showing of the presence of prohibited substance, the same

specimens will then be tested a second time by the laboratory to establish the presence or absence of a prohibited substance in the specimen.

(c)     An employee who tests positive under (b) above will be placed on medical leave of absence and will be required to undergo and successfully complete a recommended rehabilitation program. The failure or refusal to enroll in a recommended rehabilitation program within fourteen (14) days will result in the employee's termination.

(d)     An employee who successfully completes the recommended rehabilitation program will be eligible for reinstatement to active employment, based upon the recommendations of the rehabilitation program director and evaluation by the Occupational Health Clinic, and subject to such conditions as may be appropriate in light of the employee's job classification and duties.

(e)     An employee who is returned to active employment following rehabilitation will be required to participate in such after-care program as may be recommended by the rehabilitation program director and shall be subject to random testing for prohibited substances for a minimum period of one (1) year but not more than five (5) years, following return to active employment. The failure or refusal to maintain participation in an after-care program, the refusal to undergo random testing, or a positive test result, will subject the employee to immediate termination.

## ARTICLE 17
## DISCIPLINE

Section 1. The Hospital shall have the right to discipline or discharge any employee for just cause.

## ARTICLE 29
## ALTERATION AND AGREEMENT OF WAIVER

Section 1.  No agreement, alteration, variation, waiver, or modification of any of the terms or conditions contained herein shall be made by any employee or group of employees with the Hospital, and no amendment or revision of any of the terms or conditions contained herein shall be binding upon the parties hereto unless executed in writing by the parties hereto.

Section 2. The waiver of any breach or condition of this Agreement by either party shall not constitute a precedent in the future enforcement of all the terms and conditions herein.

Section 3. The Hospital and the Union acknowledge that this Agreement and all letters of understanding or other documents executed by the parties totally integrate all wages, hours, terms and conditions of employment existing between the parties, eliminating all past and existing practices unless otherwise stated.  Further, the Union and Hospital acknowledge that each has had ample opportunities to submit proposals and bargain over all negotiable matters and that with this Agreement and all letters of understanding or other documents executed by the parties the Union hereby expressly waives any right to bargain over matters covered by this Agreement and all letters of understanding or other documents executed by the parties during the term of this Agreement.  Any articles of sections not expressly modified in writing will remain the same as the May 1, 2006, Agreement."

## CLEVELAND CLINIC SUBSTANCE ABUSE POLICY

***

**Policy Statement**

Cleveland Clinic is committed to maintaining a safe, healthful and efficient working environment for its employees, patients and visitors.  Consistent with the spirit and intent of this commitment, Cleveland Clinic prohibits the misuse of alcohol and drugs as discussed in this policy.

**Definitions**

***

**Illegal Drugs and Controlled Substance:**  Includes any substance which in any manner alters normal perception, thought functions, behavior or mood, including, but not limited to marijuana (regardless of whether it is prescribed medical marijuana or in a product like CBD oil derived from cannabis), cocaine, narcotics, tranquilizers, amphetamines and barbiturates.

**Impairment:**  The effect of the use of alcohol or any psychoactive or mood-altering substance or any mental, emotional and/or physical functioning. Symptoms may include, but are not limited to, drowsiness and/or sleepiness, odor of alcohol on breath, slurred/incoherent speech, lack of manual dexterity, lack of coordination in walking, and unexplained work related accident or injury.  Prohibited impairment includes any detectable amount of an illegal drug, controlled substance and/or alcohol in an employee's system and may be asymptomatic yet result in a positive test.

**Policy Implementation**

**Prohibited Conduct**

Cleveland Clinic prohibits:

***

B.  Reporting to work or working while impaired or under the influence of any illegal drug, any controlled substance, and/or alcohol.

**Random Testing**

Employees will be subject to random, unannounced drug testing throughout the year.  When notified that they have been selected for random screening, employees must report to the designated testing site within the time frame designated by Occupational Health regardless of their work location (e.g., onsite, hybrid, or remote) unless on preapproved Paid Time Off on an approved leave of absence.  Detection of a controlled substance (except marijuana) for which an employee has a valid prescription will not, standing alone, result in a positive drug test. Additionally, random alcohol testing will be conducted where required by Department of Transportation regulations.

**Reasonable Suspicion of Impairment/For-Cause Referral**

**Reasonable Suspicion Testing**

An employee may be subject to "for Cause" urine and/or breath testing when reasonable suspicion exists that the employee appears to be working in an impaired condition and/or under the influence of drugs and/or alcohol.  A reasonable suspicion referral for testing will be made on the basis of documented objective facts and circumstances that are consistent with the effects of substance abuse or alcohol misuse.

***

## IV.  JOINT STIPULATIONS

1.  The grievance is properly before the arbitrator.

2.  Jamerson was employed by Cleveland Clinic Lutheran Hospital with a seniority date of 9/2020.

3.  Grievant Jamerson had no active discipline at the time of her random drug test.

4.  Grievant Jamerson was ordered to submit to a random drug test on 7/12/2024.

5.  Grievant Jamerson complied with the instructions to submit to a random drug test on 7/12/2024.

6.  Grievant Jamerson was randomly drug tested by D.R.S. Medical Review Services program.

7.  Grievant Jamerson's random test result stated that it was positive for marijuana metabolite on 7/19/2024.

8.  Grievant Jamerson was required to enroll in an EDT drug program for this alleged violation and received a corrective action at Step 3 in the form of a Final Written Warning.

9.  Grievant Jamerson utilized a combination of paid and unpaid leave during the time of this incident.

10.  The employer and SEIU District 1199 were parties to the arbitration of employee Brandon Dobias before Arbitrator Joseph Gardner, (FMCS), Case No. 230801-08098.

11. Arbitrator Gardner issued his opinion and award on the Dobias Arbitration, (FMCS) Case No. 230801-08098 on 12/11/2023.

12. The employer and the Union both received copies of Arbitrator Gardner's decision and award.

13. The Employer field a motion to vacate the arbitration award of Arbitrator Gardner in federal court.

14. The Union filed a counter motion to confirm the arbitration award of Arbitrator Gardner in federal court.

15. Federal Judge Donald Nugent issued a decision in Case No. 1:24 CV 208 that both parties received.

## V.  **SUMMARY OF THE EVIDENCE**

The first witness called by the Employer was Dr. Craig Thorne, who is currently employed by the Cleveland Clinic as the Medical Director of Occupational Health.  Dr. Thorne testified that he has served in this position for just over two years, and prior to that time he served as medical director for various other entities, including the D.C. Police Department and U.S. Secret Service, among others.

Thorne testified that his department provides core occupational services for caregivers, including drug testing and health and wellness programs.  He stated that Cleveland Clinic's policies include random drug testing, which is important because it deters drug use.  Thorne stated that random testing ensures that caregivers are paying attention to their duties, are healthy, and are diligent in their job.  He stated that the goal is to protect patient safety, and also to help caregivers who may be using drugs in order to get them the professional help they need.

Thorne explained that the Employer uses the standard 10 panel drug test which is commonly used in healthcare across the country.  The test checks for the presence of marijuana, PCP, cocaine, codeine, morphine, pain killers, opioids, Darvocet, Percocet, and even Fentanyl. He noted that Fentanyl is a substance which can be stolen in a surgical environment.

When asked how marijuana impairment can affect functioning, Thorne testified that the effects of marijuana have been studied, tested and published by the DHS and the federal government for three decades, and it has been determined that marijuana use impairs judgment,

cognition and coordination.  He stated that marijuana testing differs from alcohol testing because alcohol is metabolized quicky, but marijuana is prolonged in the system depending on the concentration.  Thorne noted that marijuana levels can vary based on the type of use – for example, gummies are of higher concentration.  He stated the effects are felt within 30 minutes, peak in 2-4 hours, and can last up to 12 hours.  Thorne testified that impairment in the workplace can effect patient safety.

When asked to about the potential impact of marijuana use on the Grievant's job duties, Dr. Thorne testified that there are detailed protocols that must be followed in equipment sterilization.  He stated that improper sterilization could result in hospital-based infections that could then spread to other patients.

When asked to explain the Employer's random testing process, Thorne testified that all caregivers are part of a pool which is handled by a third party, DRS, which operates outside of the Clinic's direct administration.  He stated that the third party involvement ensures that there is no conflict of interest.  Thorne stated that if an employee is notified that they have been randomly selected by DRS, the employee must then appear that same day for drug testing.

Thorne testified that marijuana testing is done through urinalysis which is testing for THC, Delta 9.  He stated that a positive test means that the person had either injected, vaped or inhaled marijuana.

Thorne identified page 2 of Jt. Exhibit 3 as the Chain of Custody form.  He stated that the form shows the Grievant donated urine for testing and that the temperature of her urine was between 90 and 100 degrees, which is appropriate and eliminates any concern about a substituted sample.  Thorne testified that the urine was split into two different vials, both of which were signed for by the Grievant certifying that she had given the sample and had not adulterated it in any manner.  He stated that the Grievant was given the option to send one of the two vials to an independent lab for verification if she had chosen to do so.  Thorne testified that the test results came back positive for marijuana metabolite at a level of 100 nanograms per milliliter.

On cross-examination, Thorne acknowledged that he is not at all familiar with the CBA or the details of the parties' agreement.  He testified that he does not know if random drug testing is allowed under the CBA.  Thorne agreed that the Employer is not operating under a federal government edict so there is no obligation placed by the government to do drug testing.  Thorne

testified that he has never been randomly tested, although he is on the list.  He stated that all employees, from entry level positions up to the CEO, are in the pool for random drug testing.

The next witness called by the employer was Tyler Camp who has been with Cleveland Clinic for nearly 9 years.  Camp testified that he is currently the Director of Occupational Health, and he has held this position for 6 years.  He stated that Occupational Health oversees the health and wellness of all caregivers, and manages physician responsibilities, flu shot campaigns, and random drug testing.  Camp testified his department is involved in the administration of the program.

When asked how the random drug testing selection works, Camp testified that the Clinic does not select the employees to be tested.  Instead, the Clinic partners with IHRS who then partners with another outside source to make the selections.  Camp stated that the Clinic has over 70,000 enterprise-wide caregivers, and IHRS splits that number onto 11 separate lists based on their jobs, whether nurse, police, physician, or something else.  He stated that IHRS does not really perform a human resources kind of function, but more of a technology function where they randomly select employees by their employee numbers and decide who will be tested.  He explained that the only information contained on the list provided to the third party is the employee ID number.  The third party provider then randomizes the list and sends it back to IHRS and they will then send it back to Occupational Health for those people to be tested.  Camp stated that the random testing process happens on a monthly basis.

Camp testified that there are two ways to notify an employee that they have been selected for testing.  If the employee has a Cleveland Clinic iPhone, Occupational Health will call them directly.  If not, Occupational Health will call the person's manager who will instruct the employee to go and get tested that day.  Camp stated that Occupational Health has no involvement in the discipline.

On cross- examination, Camp agreed that he has no interaction with the Union and no familiarity with the CBA. He stated that his role is simply to act as facilitator, not selector, of employees who are selected for random drug testing. Camp confirmed that the Grievant was selected in June of 2024 to be tested in July 2024 for a random drug test.

The  next witness called by the Employer was Dr. Amy Freadling who currently serves as the Senior Director of Caring for Caregivers.  She stated that she has held this position for 6 ½

years, and has been with the Cleveland Clinic for 23 years.  Dr. Freadling testified that she has a Ph.D. in counselling and human development.

Freadling testified that Caring for Caregivers offers counseling, support and referrals to employees and other members of their households.  She explained that when an employee tests positive for alcohol or drugs, Caring for Caregivers will provide support and offer help to ensure that the employee gets the services they need to get fit and ready to return to work.

Freadling testified that the Grievant gave a urine sample on July 12, 2024.  The test results came back positive on July 19, 2024 and her department was notified at that time.  Freadling stated that it was the job of her department to notify the Grievant's manager and HR.  She explained that the policy is to take the employee off work and schedule an appointment for evaluation.   Freadling testified that the first step is for the employee to meet with a member of her team and sign an agreement to meet with an outside evaluator.

Freadling explained that around August 6, 2024, her department was notified that the Grievant did not need any further treatment.  Because there were no further recommendations from the evaluator, the only stipulation was for the Grievant to produce a clean drug screen in order to return to work.  She added that based on some information she received from the evaluator, she hesitated to start the process because there was a concern that the Grievant might still test positive.  Freadling explained that this did turn out to be the case because she again tested positive on August 19th.  After that, a second return to work screen was performed on August 26th  which produced a negative result, and the Grievant was returned to work on August 29, 2024.

On cross-examination by the Union representative, Freadling testified that she has no involvement in the Human Resources process with respect to the administration of discipline.  She stated that she is also not involved with the parties' CBA.  Freadling further testified that she has absolutely no oversight of the HR and Drug Testing Policy.

The next witness called by the Employer was Mitchell Smith who has been the Manager of the Sterile Processing Department ("SPD") for the past 3 years.  Smith stated that he has worked for Cleveland Clinic off and on over many years, and has been employed with the Cleveland Clinic for 7 years this time around.  He testified that he was previously the SPD Supervisor and has held various positions in SPD in his 45 year career.

Smith testified that the primary goal in SPD is to provide sterile instrumentation and supplies to the Operating Room.  He stated that the Grievant's job duties are to decontaminate surgical instruments, prepare and sterilize surgical instrument trays, and stack carts. The Grievant also helps prepare surgical and medical equipment for various floors in the patient care units. Smith testified that the training for the Grievant's position is initially 90 days of classroom work on the main campus followed by another 90-day training program at the Lutheran Hospital. Smith stated that it takes at least one year to achieve competence in the position.

When asked about the skills required for the Grievant's position, Smith testified that it is a skilled position  and a very manual job. He stated that employees must have the ability to fully decontaminate instruments and to do so they need a high level of acuity. Smith explained that if instruments are not cleaned correctly it can impair sterilization and cause infections. He stated that no one really oversees the Grievant's performance in real time because employees usually work alone at their work station. Smith agreed that if an employee was impaired, it would impact his or her ability to do the job safely and efficiently. He explained that one must be able to catch it if an instrument is dirty or soiled, and if one is impaired and fails to notice it, it could have serious health implications for the patient.

Smith testified that as manager, he was notified of the Grievant's drug test.  He stated that his job was to inform the Grievant that she had been randomly selected and needed to take the test.  Upon completion, he was obligated to inform her of the positive result.  Smith testified that he was involved in the disciplinary process when the Grievant was returned to work.  He stated that the Corrective Action was prepared, and he issued it to the Grievant.

On cross examination, Smith agreed that he has no involvement in the drug testing other than notification of the employee.  He acknowledged that he has no involvement in the human resources aspect of the Employer, nor any involvement with the Union or contract negotiations although he did participate in some planning sessions.  Smith stated that he is familiar with the Grievant's job description.  He testified that he is not aware of anything in the job description that says the employee will be subject to random drug testing before they are deemed competent. When asked if there is a test for competency, Smith stated that there is a competency test that all CSR Techs must pass annually.  If an employee fails the test, they will get remediation and education to get them up to speed.

The final witness called by the Employer was Rachel Batista who is the HR Director for the Employer.  She stated that she has held this position for approximately 13 months.  Batista testified that she is familiar with the random drug testing program, and that the program was implemented in July of 2016.  She stated there were discussions with the Union beginning in mid-2015, and a final letter was sent to the Union on May 20, 2016, letting the Union know that the Random Drug Testing policy ("RDT") had been implemented.   Batista testified that all caregivers were enrolled in the RDT on June 1, 2016, and that the Employer has consistently been administering random drug tests since 2016.  Batista identified Employer's Exhibit 2 as the May 20, 2016 letter to the Union which she stated is a true and accurate copy taken from the Employer's business records.

When asked where management gets the authority to implement the random testing policy, Batista testified that the management rights clause contained in Article 1 gives management the right to establish reasonable rules of conduct or safety.  She further testified that the Hospital has retained the right to implement any rule which has not been bargained before, and that there are no express restrictions placed upon it by the CBA.

Batista testified that in the years leading up to 2023, the Union did not file any objections, challenges or grievances pertaining to the Employer's RDT policy.  She explained that other than the Grievant, there were only four other bargaining unit members who have been disciplined for positive results on a random drug test.  Batista stated that of those four individuals, only Brandon Dobias's case resulted in a grievance being filed.

On cross-examination, Batista testified that she has worked for other employers who had a CBA in place.  She stated she is familiar with the CBA in this case.

Batista acknowledged that she has been made was aware of the arbitrator's decision in the Dobias case, but she testified that there were differences in that case that are not present here  She explained that in Dobias's case, the Corrective Action mistakenly stated that he had a positive alcohol test, yet Dobias had actually tested positive for drugs.  Batista stated that the discipline was also untimely and that is what the arbitrator ruled upon.  Batista acknowledged Judge Nugent's ruling denying the Employer's motion to vacate the arbitration decision.  She added that that the judge did not vacate the Employer's ability to conduct random drug testing.

When asked if it is her opinion that the CBA does not preclude random testing, Batista responded that random testing is not mentioned and thus is not prohibited.  She agreed there is a

provision in the CBA that talks about testing based on reasonable suspicion. Batista acknowledged the existence of a rule of contract construction that provides that lists are presumed to include everything the parties intended, but she stated that the management rights clause provides that anything not specifically covered remains a reserved right of the Employer.

When asked what kind of investigation was undertaken in the Grievant's case, Batista stated that all of the needed information was provided by Occupational Health. She stated there was no need for further investigation because it was clear that the Grievant tested positive in violation of policy. Batista testified that she does not know when the machine used to test the urine sample was last calibrated. She stated that she does not know the number of false positives that have been recorded in the past two years.

Batista agreed that the CBA states that the decision of the arbitrator shall be final and binding upon all employees. When asked why she would then continue the RDT program after the decision in the Dobias case, Batista stated that Arbitrator Gardner's Award only applied to Mr. Dobias. Batista stated that the Employer complied with that decision and paid Mr. Dobias his back pay.

On continued cross, Batista acknowledged and agreed that Article 29, Section 3 nullifies any past practices, agreements or modifications to the terms of the CBA unless made in writing by the parties.

The first and only witness called by the Union was Tracy Cutright who is the Member Resource Center Director for the Union. Cutright testified his primary duties and responsibilities include supervising a staff of five, handling arbitrations, mediations, reviewing work of subordinates and making decisions on day-to-day activities. He stated that he has been involved in Union work since 1985 and has held every title on the Executive Board at some period of time.

Cutright testified that he has served as the Union's lead advocate in two arbitration cases with the Cleveland Clinic. He stated that one of those cases involved Brandon Dobias who was charged with possession and consumption of alcohol in 2023. Cutright explained that, like the Grievant, Dobias was randomly drug tested and was required to enter a diversion program. He stated that when Dobias was ultimately returned to work, he was placed on a final written warning which is one step before termination.

Cutright explained that Arbitrator Joseph Gardner ultimately issued the decision in the Dobias case, sustaining the grievance and providing a make whole remedy.  Cutright testified that the Hospital appealed that decision and filed a motion to vacate with the U.S. District Court for the Northern District of Ohio.  He stated that the Union then responded and also filed a counterclaim.

When asked about the Judge's ruling in that case, Cutright stated that Judge Nugent found that even though the arbitrator was not specific in his findings, he clearly found that the lack of a contractual policy with respect to random drug testing was improper.  He stated that the judge also agreed that the Employer made a recognizable error when it meant to charge Dobias with marijuana but instead charged him with testing positive for alcohol.  Cutright stated there were four grounds the judge used to affirm the arbitrator's decision; 1) random testing was a unilateral policy enacted by the Employer; 2) erroneous charge; 3) drug test positive for marijuana metabolite, but policy only prohibits marijuana; and 4) the Employer had no reasonable suspicion to test.

Cutright testified that the CBA in effect in the Grievant's case is not the same as was in effect with Dobias, but the relevant language has not changed.  He stated that the parties were in the middle of heated negotiations at the time all of this was going on.

Cutright stated that he is familiar with the Grievant's case and is aware that the allegations against her involve a positive test for marijuana metabolite, which is the same finding as was present in the Dobias case.  He stated that the Grievant was referred to the aftercare program and issued a final written warning, which was the same as it was for Dobias.  Cutright testified there are no differences in the way that Dobias and the Grievant were treated with respect to the random drug testing.

Cutright further testified that based on the prior arbitral award in *Dobias,* and Judge Nugent's decision affirming that award, it is his opinion that there must be probable cause based on reasonable suspicion in order for the Employer to conduct drug testing.  He stated there is no allowance or leeway which would allow for random drug testing.

# IV.  DISCUSSION AND DECISION

### I.    Did the Grievant Violate the Hospital's Substance Abuse Policy

The standard by which the merits of a dispute involving discipline or discharge must be judged is set out in Article 17 of the parties' CBA which requires the Employer have just cause. As traditionally explained by arbitrators, the concept of just cause involves three basic elements. The first requires a determination with respect to whether the Employer has carried its burden of proving that the grievant is in fact guilty of the misconduct of which he or she is accused. Absent an affirmative finding in that regard a discipline obviously cannot be upheld.

Assuming the issue of guilt is decided in the affirmative, the remaining element for just cause requires a determination as to whether the imposed discipline is a just or fair penalty for this particular employee in the light of any mitigating factors or extenuating circumstances which may be reflected by the record as a whole.  In making that determination arbitrators generally agree that once proof of the offense has been established, the determination as to the penalty lies primarily within the discretion of management, but that some limited arbitral review with respect to that issue is proper.  In that regard, if the penalty is so harsh due to the nature of the offense and any mitigating factors that it is found to be unfair, or if it was imposed for proscribed reasons other than the underlying offense, or if it was imposed in a manner that undermines the grievant's due process rights, the penalty may be overturned or modified by an arbitrator.  It is equally well settled that an arbitrator may modify or rescind the penalty where the evidence demonstrates that the employer's decision was arbitrary, capricious, discriminatory or otherwise violative of fundamental notions of fairness and/or due process, or that the employee did not have fair warning of the rule pursuant to which he or she was terminated, as well as the disciplinary consequences that would flow from violating that rule.

Focusing initially on the question of guilt, I find there is simply no question that the Grievant is guilty of the misconduct of which she is accused.  The evidence shows that on July 12, 2024, the Grievant was selected for a random drug test, and she reported for the test as required.  Consistent with industry standards, the Hospital tested the Grievant for the presence of marijuana metabolites through urinalysis.

The evidence shows that the Hospital follows modern testing protocols that use threshold levels of 50 ng/ML for initial testing and 15 ng/ML for the confirmatory test to reduce the

likelihood of detecting extremely remote cannabis use (e.g., from second-hand smoke or distant past use).  Following lab-testing utilizing a two-part (initial and confirmatory), the Grievant's results revealed a positive test for 100 ng/ML of marijuana metabolite, reflecting a concentration at twice the testing threshold.   Her positive test result was then verified by a medical review officer.   Arbitrators have consistently recognized that this evidence alone is sufficient to establish impairment.  *See  Barton 1792 Distillery*, 133 BNA LA 404 (Kininmonth 2014) (drug test results sufficient to establish impairment); *United Parcel Service*, 101 BNA LA 589 (Briggs 1993) (explaining that acceptance of testing results "is consistent with the bulk of arbitral authority").

This conclusion is reinforced by the fact that the Grievant did not testify or otherwise present any evidence at the hearing that would serve to refute her impairment.  The absence of such testimony or evidence, at best, "leaves the case against [her] unrefuted." *See Klosterman Baking Co.,* 2000 BNA LA Supp. 108265 (Kilroy 2000) (upholding discharge in drug testing case; noting, "while I am reluctant to conclude that the failure of the Grievant to testify creates an adverse inference against him, it is apparent that his failure to testify at minimum leaves the case against him unrefuted.")

Moreover, for the avoidance of any doubt, Dr. Thorne offered convincing and unrebutted testimony in this case that Grievant's drug test for marijuana metabolite conclusively demonstrated the presence of marijuana in her system and her use of marijuana in violation of the Hospital's Substance Abuse Policy.

It is also undisputed that the Grievant had fair warning that the conduct she engaged in could result in discipline.  The Hospital had a well-published and long-established rule that prohibited employees from engaging in drug-related "impairment."   The Hospital's Substance Abuse Policy defines "impairment," to include "any detectable amount of an illegal drug … in an employee's system and may be asymptomatic yet result in a positive test."  Additionally, prohibited substances include "marijuana . . . regardless of whether it is prescribed medical marijuana or in a product like CBD oil derived from cannabis …"  Thus, the Grievant had clear notice that if traces of marijuana were detected to be in her system pursuant to a workplace drug test, she would be in violation of the Hospital's Substance Abuse Policy.

For these reasons, and as supported by arbitration decisions in similar cases, the Hospital has met its *prima facie* burden to show just cause for Grievant's final warning for violating the Hospital's Substance Abuse Policy based on her positive random drug test.

## II. Contract Violation by the Hospital

Although the Union does not challenge the Grievant's positive test or claim she was not aware of the Hospital's rule, the Union maintains that Employer's actions in randomly testing and imposing discipline on the Grievant nevertheless fail to meet the tenants of just cause. It is the Union's position that the CBA mandates that Employer's right to drug test must be based on reasonable suspicion of use. Because it is undisputed that the Employer had no reasonable suspicion to test the Grievant on July 12, 2024, the Union contends the Hospital acted in violation of the CBA by requiring her to undergo a random drug test.

### A. Positions of the Parties

1. Union's Position

It is the Union's position that the parties' Substance Abuse Prevention Policy, memorialized in Article 16 of the parties' CBA, only allows drug testing based upon reasonable suspicion of use. The Union points out that since 2015, the parties CBA has contained an article devoted exclusively to substance abuse and testing. The Article 16 language contained in the 2023-2026 Agreement which that was in effect at the time of this incident contains the same exact language as was in the 2015-2020 and 2020-2023 Agreements. The Union maintains that it was under no obligation to demand to bargain over the Hospital's random testing policy as the contract governed this issue in its entirety.

The Union points out that pursuant to Article 29, Section 3, the Union and the Hospital have acknowledged that "this Agreement and all letters of understanding or other documents executed by the parties totally integrate all wages, hours, terms and conditions of employment existing between the parties, *eliminating all past and existing practices unless otherwise stated*." The Hospital did not insert their policy or otherwise modify the language of Article 16 to include any random testing when it was bargained in 2023. The Hospital is not free to enforce any unilateral policy that contains a subject that has been memorialized in the Agreement.

In addition, the Union argues that the Employer has been clearly and explicitly prohibited from conducting random drug tests. In support of its position, the Union has introduced into

evidence an arbitration award ("the Dobias Award") issued by Arbitrator Joseph W. Gardner on March 27, 2024.   In his Award, Arbitrator Gardner determined that the Hospital lacked just cause to discipline bargaining-unit employee Brandon Dobias following his random drug test for marijuana.  Following cross-appeals by the parties, Arbitrator Gardner's award was confirmed on appeal to Judge Nugent of the U.S. Federal District Court on August 8, 2024.

The Union alleges that the facts in the Dobias case are identical to the facts at hand, and that pursuant to Article 5, Section 5, Arbitrator Gardner's Award was final and binding on the Employer.  Moreover, the award was confirmed on appeal in August 2024.  The Union argues that the Hospital, clearly dissatisfied with the result, then defied the Award and the Judge's order by issuing a final written warning to the Grievant on September 9, 2024, a full month after Judge Nugent's ruling.

The Union contends that Arbitrator Gardner correctly determined that the subject of testing under the Substance Abuse Policy has already been bargained by the parties.  The policy is contained in Article 16, Sections 2 and 3 of the CBA and it allows drug testing *only* when the Hospital has "reasonable cause to suspect" the use of a prohibited substance.  The Hospital has not suggested at any time that the Grievant's testing was based in any way on reasonable suspicion.  Indeed, the parties have stipulated that it was a random drug test.  The Grievant's random test was carried out under the auspices of the Hospital's unilateral policy on drug testing rather than the drug testing provisions in the CBA.  According to the Union, management's reserved rights do not grant authority to the Hospital to implement and enforce unilateral policies that are in conflict with the express terms of the parties' CBA.

As such, because the Hospital's actions in randomly drug testing the Grievant were in clear in violation of the parties' Agreement, the Union requests that the Grievant's discipline be overturned, and that she be made whole.  In addition, the Union has requested the Employer be ordered to pay the Union's costs of preparation, presentation and advocacy in connection with the instant grievance given that the Hospital knew full well that they were prohibited from enforcing their random testing policy based on the prior Award by Arbitrator Gardner.

2.   Employer's Position

Turning then to the arguments presented by the Employer, it is the Hospital's position that the Dobias Award is neither controlling nor persuasive here.  First, the Hospital argues that arbitrators are not bound by prior awards, especially in discipline cases that must be decided on

their unique facts.  The Hospital points out that arbitrators have historically recognized significant limitations with the applicability of a previous award involving a different grievant because distinguishing factors almost always appear affecting the equities, in favor or against the employee involved, thus what constitutes just cause is a matter that must be based on the individual merits of each case.  *Great Lakes Processing,* 02/10130, 117  BNA LA 925 (Spieroff 2022).

Furthermore, the Hospital contends that the Arbitrator should not defer to or rely on the *Dobias* Award because it is easily distinguishable from this case based on several key factual and evidentiary differences.  First, although Mr. Dobias actually tested positive for marijuana, the Hospital disciplined him for violating the Hospital's *alcohol* policy, which Arbitrator Gardner found to be a significant mistake.  Here, no such mistake was made.

Second, while Mr. Dobias unquestionably tested positive for marijuana metabolite, Arbitrator Gardner found there was no evidence presented that marijuana metabolite demonstrates the presence of marijuana itself, and the Hospital did not otherwise present evidence to show Mr. Dobias possessed "any trace" of "marijuana" while working in the Hospital.  The instant case differs because the Hospital presented detailed expert testimony and evidence to establish that Ms. Jamerson's positive test for marijuana metabolite reliably and validly demonstrated that the Grievant had in fact used marijuana and had more than "trace" amounts of a prohibited substance in her system.

Third and finally, the cases involved two different grievants.  Ms. Jamerson, the Grievant here, works in a highly safety-sensitive role as a sterile processing/service technician.  Mr. Dobias, on the other hand, was employed as a porter, a non-safety-sensitive position.  The Hospital maintains that it had the right to randomly test and discipline individuals regardless of whether they were in safety-sensitive positions as all Union employees perform jobs that support patient care.  But it argues that this argument is particularly persuasive in this case given the Grievant's safety-sensitive position.

Moreover, it is the Hospital's position that contrary to the Union's assertions, Arbitrator Gardner did not conclude that the Hospital's drug testing program violates the Contract generally, and even assuming he did, that conclusion would be erroneous and should not be followed.  The Hospital argues that Arbitrator Gardner was not presented with the question (for which the Union would bear the burden of proof) as to whether the Hospital's random-testing

program violates the CBA.  Nor did he consider that question in his decision.  However, even if Arbitrator Gardner did imply that the Hospital lacked random testing rights *generally* – a question which he was not asked to and did not decide – that conclusion would fly in the face of general contract language and application interpretation principles, and this arbitrator should reject it here.

The Hospital points out that it is well-established that all rights, power and authority not specifically delegated away, shared or otherwise relinquished by management in the specific provisions of an Agreement continues to reside in management. In the instant case, the Hospital has retained the exclusive right, *inter alia*, "to establish and enforce reasonable rules of conduct, or safety, of efficiency, and order in its operations and on its premises." (CBA, Article 1, Section 1.)  While the Hospital acknowledges that the Agreement does set certain restrictions on the procedure to be applied when conducting *reasonable-suspicion* testing, it maintains that nothing in contained in Article 16 or any other Article prohibits the Hospital from conducting other forms of testing, including random testing.

The Hospital further argues that the parties' Agreement expressly recognizes that "<u>it is essential</u> that all employees report for and perform their duties free from **<u>any trace</u>** of drugs or alcohol." Article XVI, Section 1 (emphasis added).  Together, these provisions reinforce the Hospital's ability and *obligation* to prevent any trace of drugs or alcohol in the workplace, subject only to express restrictions specified in the CBA.

In the Employer's view, if the parties had merely intended to prohibit active drug or alcohol "impairment," they would not have agreed to the prohibition on possessing even a "a trace" of drugs or alcohol in the workplace. As used in both common parlance and arbitral decisions, the contractual prohibition on even "trace amounts" of a drug is tantamount to zero tolerance and goes well beyond a mere prohibition on being "under the influence."

The Hospital maintains that given the lack of random testing restrictions in the CBA, as well as the contractually affirmed need to prevent "any trace of drugs or alcohol," the Hospital's implementation of a random testing program was both a reasonably and contractually permissible exercise of its management rights.  For this reason alone, the Union cannot show that the Grievant's discipline violated the CBA.

The Hospital argues that this conclusion is further reinforced by its eight-year history of consistently applying its random testing program, with no challenge whatsoever from the Union (until, if at all, the Dobias grievance). Had the Union believed that the random testing program violated the CBA, it could have filed a grievance in 2016 when the program was implemented. It could have also filed grievances challenging discipline issued to other bargaining unit members who tested positive and were disciplined under the random testing program over the years. The Union did not do so. Thus, as arbitrators have recognized, the Union "waived its right to challenge the Hospital's authority to engage in random testing." *Citing Ohio Power Co.,* 1997 BNA LA Supp. 103732 (Brown 1997) ("Moreover by acquiescing over a several year period to this testing program, the arbitrator finds that the union has effectively waived its right to challenge the company's authority to engage in random drug testing."). For all of these reasons, the Hospital asks that the grievance be denied.

### B.  Findings and Conclusion

As a beginning point for this analysis, it should be pointed out that with respect to this issue, the Union is the moving party. As such, the Union bears the burden of proving, by a preponderance of the evidence, that the Employer has acted in violation of the CBA. As the arbitrator explained in *Johnston-Tombigbee Manufacturing Company,* 113 LA 1015, 1020 (Howell, 2000):

> ... The general rule, followed by most arbitrators in non-disciplinary proceedings, is that the grieving party, typically the union, bears the initial burden of presenting sufficient evidence to prove its contention. It is therefore usually up to the union to demonstrate that the action taken by management is inconsistent with some limitation, contractual or otherwise, in the labor agreement ...The doctrine of burden of proof simply means that the party who asserts a claim or right against another party has the burden or responsibility of proving it.

This arbitrator remains mindful of the principles generally applied when the issues involve the interpretation of provisions in collective bargaining agreements. In *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597 (1960), the Supreme Court explained, "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement."

As with any contract interpretation case, "the first reference is to the specific terms of the parties' agreement.  If they unambiguously resolve the point at issue, the arbitrator has no choice but to apply them as written."  *East Liverpool Board of Education and East Liverpool Education Association,* 113 LA 1127, 1129 (Fullmer, 1999).  The arbitrator's "task is limited to construing the meaning of the collective-bargaining agreement so as to effectuate the collective intent of the parties."  *Barrentine v. Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 744 (1981).  Collective bargaining agreements are to be interpreted "according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy."  *M & G Polymers USA, LLC v. Tackett,* 544 U.S. 427, 435 (2015).  "In this endeavor, as with any other contract, the parties' intentions control."  *Id.*  "Where words of a contract in writing are clear and ambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent."  *Id.*

Nonetheless, "[i]n order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to such agreements."  *Transportation-Commc'n Emp. Union v. Union Pc. R. Co.,* 385 U.S. 157, 161 (1966 Judicial doctrine recorded in § 202 of the *Restatement (Second) of Contracts* holds that when the principal purpose that the parties intended to be served by a provision can be ascertained, the purpose is to be given great weight in interpreting the words of the provision).  Arbitrators agree that an interpretation in tune with the purpose of a provision is to be favored over one that conflicts with it.

And when the contract is ambiguous or silent on a particular issue, the arbitrator may consider extrinsic evidence, such as bargaining history, to determine the intentions of the parties.  *Tackett v. M & G. Polymers USA, LLC,* 811 F.3d 204, 208-09 (6th Cir. 2019).  Indeed, precontract negotiations frequently offer a valuable aid in the interpretation of ambiguous provisions.  Where the meaning of a term is in dispute, it will be deemed, if there is no evidence to the contrary, that the parties intended it to have the same meaning as that given it during the negotiations leading up to the agreement.  *See* Elkouri and Elkouri, *How Arbitration Works,* 6th Ed., at 453, and cases cited at FN 109 therein.

When these concepts and principles are applied to the present case, especially with reference to the language of the Agreement, the bargaining history, and the arbitral precedent, the only conclusion that can be properly drawn is that the Hospital's efforts to create entitlement to conduct random testing pursuant to its unilateral substance abuse policy are misguided.

As a starting point or this discussion, the Hospital has appropriately pointed out that arbitrators are not bound by the rationale of earlier decisions.  It is well-recognized that "principles of stare decisis and res judicata do not have the same doctrinal force in arbitration proceedings as they do in judicial proceedings..." *Connecticut Light & Power Company v. Local 420, International Brotherhood of Electrical Workers, AFL-CIO*, 718 F.2d 14 (2nd Cir. 1983). In discipline cases, particularly, arbitrators have historically recognized significant limitations with the applicability of a previous award involving another grievant:

> Particularly in cases arising out of the discharge of employees would the use of prior cases as binding precedents be unfortunate. A decision in such a case requires an appraisal of personalities and circumstances which vary from plant to plant. Distinguishing factors almost always appear affecting the equities, in favor of or against the employee involved, such as his length of service, the manner in which he performed his regular work, the relations between the union and the employer in that particular plant, the effect of the offense upon other employees, and other similar factors.

Even though prior awards are not binding, arbitrators may choose to take guidance from the reasoning of earlier decisions provided there is sufficient overlap.  Arbitrators may also find it appropriate to give considerable weight to past arbitration decisions where similar issues have been argued by the same parties and decided under similar or identical contract language.

Bearing these considerations in mind, while I find that the Award in the Dobias case is not a model of clarity and is also distinguishable from this case based on a number of factual differences, I nevertheless satisfied that Arbitrator Gardner likely concluded, correctly, that the Hospital's enforcement of its' unilaterally-imposed random drug testing program violates the CBA.  And, with reference to the case before me, the evidence and the contract language can lead to none other but the same conclusion.

As a preface to this discussion, it well-recognized that when an arbitrator is called upon to interpret the language of a collective bargaining agreement, all rights, power and authority not specifically delegated away, shared or otherwise relinquished by management in the specific provisions of an Agreement continue to reside in management.  As Arbitrator Samuel Stone explained, "you do not look to a collective bargaining agreement to see what Employer actions are allowed; rather, you look to the agreement to see if the Employer has been prohibited from performing in a certain way; or is required to perform in a certain way; or if the Employer's

actions are unreasonable in that they interfere with Employee rights protected by the agreement." *Warrior Met Coal, LLC*, 2019 BNA LA 143 (Stone 2019). Such is the nature of the task here.

In crafting their CBA, the Union and the Hospital agreed to the terms of a substance abuse prevention policy. Pursuant to Article 16, Section 1, the parties agreed that "in order for the Hospital to ensure the provision of safe, high-quality patient care services and to protect the safety and wellbeing of its patients, employees, and visitors, it is essential that all employees report for and perform their duties free from any trace of drugs or alcohol." Section 2 of Article 16 goes on to define "prohibited substances" to include, "alcohol, marijuana, cocaine, narcotics, tranquilizers, amphetamines and barbiturates, and their derivatives, and all other similar substances, whether controlled or not controlled, which in any manner alter normal perception, thought functions, behavior or mood."

In furtherance of this policy, Article 16 Section 3 expressly permits the Hospital to require a blood and/or urine test, "*should the Hospital have reasonable cause to suspect* that an employee may have used a prohibited substance prior to reporting for work or while at work, or that an employee's performance or behavior may be affected by his use of one or more prohibited substances." (emphasis supplied)

Further, the CBA addresses the subject of random testing, but does so only in the context of the procedure to be followed in the event an employee tests first positive on a reasonable suspicion test. In such case, "they will be placed on medical leave of absence and will be required to undergo and successfully complete a recommended rehabilitation program." Article 16, Section 3 (c). Further, once an employee has completed rehab and been returned to active employment, they "shall be subject to random testing for prohibited substances for a minimum period of one (1) year but not more than five (5) years, following return to active employment." *Id..*

In construing the meaning of an Agreement so as to effectuate the parties' collective intent, the Latin legal principle of *expressio unius est exclusio alterius* is well-recognized as a valuable interpretative tool. The maxim translates to mean "the express mention of one thing excludes all others" and application of this principle helps to identify what is included and what is excluded in a contract based on the explicit wording. The principle essentially means that when a law, contract, or other document clearly defines a specific type of item or thing, it will typically be understood to exclude other similar or like things, but not identical items.

Applying this principle to the matter at hand, it is clear that "random testing" and "reasonable suspicion" are "like" things. Both are testing protocols that employers might choose to implement in furtherance of enforcing a drug and alcohol policy. Indeed, support for this determination is found in the Hospital's own Substance Abuse Policy, wherein the Hospital lists reasonable suspicion testing immediately after random testing in setting forth the methods by which the Hospital purports to implement its own internal policy.

In crafting their CBA, the parties expressly and thoroughly spelled out the protocol that would be followed for drug and alcohol testing, -- testing based on reasonable suspicion. It is only reasonable then to surmise that they would also have provided for other "like" protocols for testing, and spelled out the procedures to be followed, -- had that been their intention. As previously noted, random testing is mentioned, but the CBA limits its use to follow-up testing for prior offenders. Because random testing is not otherwise provided for as a permissible method of enforcement of the Substance Abuse Policy, I find the only proper conclusion that can be drawn is that the parties' CBA contractually foreclosed the option of general random testing.

Additional support for this conclusion is found in Article 29, Section 3 of the parties' Agreement, which is a what is referred to as "zipper" or "entire agreement" clause which provides that the CBA and all letters of understanding or other documents constitute the complete and exclusive statement of the agreement between the parties. This language serves to strengthen the exclusion principle, as it suggests that no other agreements or understandings were intended to modify the specific terms of the contract.

Moreover, I find the last sentence of Article 16, Section 3 (c) to be instructive. As previously noted, this section provides that, once an employee has completed rehab, and been returned to active employment, they "shall be *subject to random testing for prohibited substances for a minimum period of one (1) year but not more than five (5) years, following return to active employment.*" (emphasis added).

In my view, the parties' decision to include a time limit here is a further indication of the parties' mutual intention to limit the use of random testing *only* to cases where an employee had already had a positive test (based on reasonable suspicion of use) and been returned to work after rehabilitation. Indeed, such language would be superfluous and unnecessary had the parties had not bargained and agreed that the use of random testing would be confined to this specific purpose. Stated another way, there would be no reason to impose a time limit on follow-up

random testing if the Hospital had not contracted away the right conduct to random tests generally.    Moreover, to conclude otherwise clearly would lead to an illogical and non-sensical result as it would mean that all employees could be randomly drug tested under the Hospital's unilateral policy at any time, and throughout the entire term of their employment, *except for proven prior offenders,* who could only be randomly tested for 1 to 5 years. This is the only result the Employer's interpretation would allow.

It is a fundamental tenet of CBA interpretation that, "[w]hen one interpretation of an ambiguous contract would lead to harsh, absurd, or nonsensical results, while an alternative interpretation, equally plausible, would lead to just and reasonable results, the latter interpretation will be used." Elkouri & Elkouri, How Arbitration Works 470-71 (BNA Books 6th Ed. 2003) (citing *The Common Law of the Workplace*: The Views of Arbitrators § 2.12 at 74 (St. Antoine ed. 2d. BNA Books 1998)). "[I]f the language contained in an agreement can be reasonably interpreted to avoid a harsh, absurd, or nonsensical result, which becomes the preferred interpretation." *BOCES Teachers Association and DCMO Board of Cooperative Educational Services*, 2022 BNA LA 577 (Scanza, 2022); *See also, American Safety Razor Co. and IBEW Local 173,* 90 LA 1140 (M. Bowers, 1988).  Under the interpretation advanced by the Hospital, repeat offenders would only be subject to random testing for 1 to 5 years following their first positive test while all other employees could be subject to random testing at any time during their employment.  This is the obvious absurdity against which the rule cautions.

Having so concluded, a final contention raised by the Hospital must be addressed.  The Hospital maintains that in November 2015, it Hospital notified the Union of its intent to expand its drug testing program to include random testing for all caregivers, organization-wide.  In that regard, the evidence shows that although, "[a]t no time did the Hospital consent to engage in bargaining over the content of these policy modifications," the Hospital agreed to, and did, meet with the Union to review the contents of the policies, discuss the changes and address any concerns, and bargain over the effects of the policy modifications on bargaining unit employees."  (ER. Exhibit 2, May 20, 2016 letter to SEIU).

The Employer argues that beyond the pre-implementation discussions between the Hospital and the Union, there is no record evidence that the Union ever demanded to bargain with the Hospital over the Program's implementation.  Nor is there any evidence that the Hospital refused any discussion or bargaining with the Union.  Rather, the Union simply asked

for more information, which was provided to their satisfaction.  Similarly, the Union did not file a grievance, an unfair labor practice charge, or any other challenge to the program.

The Hospital maintains that it has consistently applied its random testing program since 2016 with no challenge from the Union, until, at best, the Dobias grievance.   Had the Union believed that the random testing program violated the CBA, it could have filed a grievance in 2016 when the program was implemented, or it could have filed grievances challenging discipline issued to other bargaining unit members who tested positive and were disciplined under the random testing program over the years.  Yet, the Union did not do so.  Thus, the Employer maintains that the Union "waived its right to challenge the Hospital's authority to engage in random testing."  *Citing Ohio Power Co, supra.*

Having considered the Hospital's position, I find it without merit for several reasons. First and as previously mentioned, Article 29, Section 3 of the current 2023- 2026 CBA contains a "zipper clause," by which the parties have acknowledged that "[the] Agreement and all letters of understanding or other documents executed by the parties totally integrate all wages, hours, terms and conditions of employment existing between the parties, *eliminating all past and existing practices unless otherwise stated*."  A zipper clause such as the one in the parties' Agreement is essentially a "tamper-proof lock" on the CBA as it declares the agreement as the sole and complete understanding between the parties, zipping shut any lingering doubts about any preexisting agreements, oral or written.   In this case, I find that this language fully supports the conclusion that the terms of the Substance Abuse Prevention policy of the most recent CBA supersede any drug testing policy that the Hospital had previously imposed.

Second, Article 29, Section 1 makes clear that no amendment or revision of any of the terms of the Agreement will be binding upon the parties unless executed in writing by both parties.   While the evidence shows that the Hospital may have notified and even discussed with the Union its plan to expand its drug testing program to include random testing, the Hospital has failed to present any document whatsoever bearing a Union signature and evidencing mutual agreement to the practice.

Third, Article 29, Section 2 provides that "the waiver of any breach or condition of this Agreement by either party shall not constitute a precedent in the future enforcement of all the terms and conditions herein."   Thus, the Union's failure to protest the Hospital's unilateral

policy in past cases, at least not until the Dobias grievance, cannot serve as a bar to the Union's challenge here.[1]

In sum and in short, the Union has carried its burden of proving that the Hospital acted in violation of the CBA by conducting random testing.  It is clear from the language of Article 16 that the parties bargained only for what was provided for in their Agreement, drug testing based on reasonable suspicion that an employee has used a prohibited substances at or before reporting to work.  The Hospital cannot gain through its unilateral policies what it failed to secure through bargaining.  If the parties had intended for Hospital-wide, periodic random testing to be incorporated into the Agreement, the CBA would have said so.

In accordance with the foregoing discussion and for the reasons set forth therein, the grievance must be sustained.  The Hospital had no reasonable suspicion to test the Grievant. There was no evidence submitted at the arbitration hearing nor raised in either brief, that the Grievant exhibited any sign or symptom whatsoever of being "high" or under the influence of any prohibited substance before being ordered to take the random drug test  Instead, the Grievant's drug test was carried out under the Hospital's unilaterally-imposed policy for random drug testing rather than the drug testing provisions within the CBA.  The Hospital's unilateral policy is in conflict with the terms of parties' agreement and cannot be enforced.  Thus, the Grievant's discipline was not for just cause and must be rescinded.

Having determined that the final warning issued to the Grievant was not for just cause, the only remaining issue concerns the appropriate remedy.  In that regard, I find that the Grievant's final warning shall be rescinded, and she will be made whole for any lost wages or benefits.  Any references to the Grievant's positive drug test, rehabilitation, or discipline shall be expunged from her record.

As a final matter, the Union has requested that the Employer be ordered to pay its arbitration costs on grounds that the Hospital knowingly and blatantly violated the parties' Agreement in the Grievant's case in light of the prior arbitration Award in the Dobias case. Having considered the Union's request, I have determined that it must be denied.  I am not entirely satisfied that the Arbitrator's findings and conclusions in that case were sufficiently explicit to afford fair notice to the Hospital of the reason(s) why (or arguably, even "if") its

---

[1] The evidence shows that in addition to Mr. Dobias and the Grievant, there were only three other employees who have tested positive pursuant to the Hospital's random testing procedures since the policy was implemented in 2016.

unilateral policy was violative of the parties' Agreement.  I am hopeful that the Award herein will serve to assist the parties in resolving any lingering doubts in that regard.

## **<u>AWARD</u>**

In accordance with the foregoing opinion and for the reasons set forth therein, the grievance is sustained.  The Hospital will rescind the Grievant's final warning and make her whole for any lost wages and benefits.  The Hospital will also expunge any references to this incident from the Grievant's record.

Pursuant to Article VII, Section 5 of the CBA, this Award shall be final and binding on all employees, the Hospital and the Union.

As agreed by the parties, the undersigned Arbitrator shall retain jurisdiction for a period of sixty (60) days for the sole purpose of resolving any disputes between the parties relating to implementation of the relief ordered.  If it is deemed necessary, this jurisdictional period may be extended by the arbitrator upon request by either party.

/es/   *Amy L. Sergent*
_____
Amy L. Sergent, Arbitrator

May 22, 2025
Sarasota, Florida